All right, you may proceed. Let me just say there was a little bit of who's on first here because we have a lot of moving parts. So just to clarify, is that my understanding that Mr. Revere will take 12 minutes. Is that correct? Yes, Your Honor. With four minutes of rebuttal? Correct, Your Honor. Okay. Mr. O'Toole will take three minutes. I understand that, but I'm just asking you for clarification on the time. You have three minutes allocated, is that correct? All right. That's fine. Yeah, you don't get twice. In other words, I think she clarified that. And then Mr. Shin, you have eight minutes and two minutes for rebuttal. Is that correct? Oh, just your one minute for rebuttal. All right. That's why I just want to get this straight before we start. Yes, they will each take their time and then you'll have your consolidated time to answer all of that. And then they'll have their short time for a rebuttal. Yep, you're welcome. That's why I said we want to get this straight before we start. And with that, you may proceed. Thank you. And thank you members of the court. Again, my name is Terry Revere and I represent the appellants, the Sunday's child entities. And as Your Honor's know, this is the second time this case has been before this court. The first time that it was before this court, the court concluded it disagreed with the district court's conclusion that the settlement agreement is unambiguous. And in fact, this court ruled that a plain reading of section four of this 2011 agreement that we're here for today shows that the language is at least ambiguous. And that's the phrase that this court used and it remanded the case for further proceedings. So the issue is why are we here again? And the reason why we are here again, we shouldn't be obviously, that's our view. The reason that we're here again is the district court basically, despite the ruling of the Ninth Circuit stating as a matter of law, this contract is ambiguous and at least ambiguous. The district court said, well, we're going to rely upon the legal opinions of former counsel for my clients. And there are major, major, major problems with that. Number one being, the law of this case was determined by this court. And it's a matter of law in Hawaii, as I think in most jurisdictions, that whether a contract is ambiguous or not as well as recent Hawaii case law that says, once there's a determination that a contract is ambiguous, it's up to the trier of fact to figure that out. And specifically, the Hawaii Supreme Court and the Hawaii Appellate Court, the Intermediate Court of Appeals has said you don't get to rely upon lawyers. You don't get to hire architects to construe construction contracts or lawyers to construe other contracts. And so, what- Well, if you could, though, you don't get them to give you a legal opinion as to what the contract says. That's right. But this is a little more nuanced because this has to do with whether certain of the communications may have been imputed to Wang. And that's a little bit different than the lawyer saying it's ambiguous or it's not ambiguous or it means X or it means Y, don't you think? No, I think that's fair. I think that's fair, Judge. And the problem here, of course, is then what leads to that? Because here, the evidence is completely clear that what Mr. Price, who represented a whole group of buyers suing the developer here, what was very clear is he had one communication with the client about this. From our client's perspective, he said, just sign the F contract. There was no advice given and Price admits he didn't advise her to the terms. So, there's no factual basis to get to your Honor's point to say, oh, well, this is what this means because I'm the lawyer and I negotiated. He didn't negotiate it. So, there's no difference between Mr. Price's opinion about what it means than any other lawyer or any person on the street. And that's just one of the problems. The other issue that comes up in these summary judgment cases is always the so-called self-serving affidavit, obviously, of one of the clients, and in this case, your client. So, what is it, in your view, that would take this case out of that normal principle that you don't get to just put a self-serving affidavit up and then spring the summary judgment? And I think that's right. Well, one of the things I think that takes it out of that very clearly is the plain language of this contract itself, which talks about, hey, if you give us this extra money, you've got extra time and those additional payments might be forfeit if you don't close. But it's completely silent on what about the initial deposits and what about Hawaii law. And one of the things, I would respectfully submit that, and Your Honor, and it's also nothing new under the sun. Parties are in litigation. Everybody is self-serving interests, I would respectfully submit. But I think that's a big problem. The other problem is Mr. Price had a massive conflict, which is he wanted all of these cases settled in a big package, and that's why he's urging her to just sign it. And I agree, Your Honor. I mean, a jury could sit there and say, well, you know, I don't believe Ms. Wang, but the jury should have been given that opportunity, especially... And really all you're asking is go back and then let everybody state their case, so to speak. Yeah, and Your Honor, this is not, despite the, it's sort of like the Trojan War here, it's gone on for so long, but the trial itself, and again, I'm appellate counsel, you know, it's like being my law clerk days again, but this is not going to be the world's trial. Presumably there'd be a representative from Iron Gate saying this is what the intention were, and Ms. Wang would testify, because that's really what it boils down to. The other thing, Your Honor, I think that, you know, is important that got lost in the shuffle here is everybody, including Iron Gate, agrees on this pretty fundamental view of Hawaii law under the Gomez case, which is just because you have a deposit, you still need to show that the damages that you deposit. And so here the court just said, well, I agree with these guys, and then there's no thing about what about the fact that even if they don't believe a word my client says, they still need to show that there's some rational relationship between these huge deposits and their damages, and that simply never happened here. And what's disturbing to me about this case, Your Honor, is this isn't a windfall situation. This is a triple windfall. They kept the original money, the original deposits, they kept the, excuse me, these additional payments, and they kept the unit, which went up in value. So there's no damages here, and they're just piling on windfall after windfall, and we think it's completely inappropriate, and other things like unclean hands, unconscionability, and just their basic burden of showing, yeah, these monies we kept are commensurate with our damages. They just never proved it. It just never got there. And that's even if the ambiguities that this court has already pointed out were completely ignored. They still have to go back and prove that. And again, this is not going to be the world's longest trial. I think that that, you know, obviously should happen. And Your Honor, I'll just... Let me just ask you hypothetically. If we were to disagree with you that, you know, summary judgment was appropriate up to a point, you're saying you still need this relationship. Correct. Is the relationship issue something that could be decided on summary judgment, in terms of the relationship between the deposits and the damages? No. Your Honor, they would have to show that they had, that's clearly a question of fact to show, look, this 1.4, that's commensurate with the loss that we got. Now, if this were back in 2009, and the sky is falling economically all over the world, and they had to sell these units for a lot less, I think they could do it. But they can't do it. They know they can't do it, because the value, the units all went up in value. So the clause in the 2006 contract said that they could retain the deposits up to 15% of the deposits or their damages. So if they don't show damages, can they still retain the 15%? The answer under Hawaii law is no. I understand the plain language is exactly as Your Honor quoted it, but... So there's two points. The 15%, the 20%, that extra 5% ought to be coming back, unless Your Honor, or unless they can actually prove, well, no, because we took a huge loss on these units, ergo, we're entitled to that full 20%. And what we submit is, what Hawaii law says, you don't even get the 15% if you don't have any real damages. And that's the problem here, is they don't. And that's why they're obviously fighting it. I'm sorry, it looks like I'm over my time. If I could just have one minute on the Rule 11 sanctions. Pretty much everything that could go wrong with the Rule 11 motion did go which is problematic. And they imposed it in a case where my client has been paying by the hour. It makes no sense to say, I believe this case is frivolous, but I'm just going to keep on spending money pursuing a frivolous case. And despite numerous attorneys have supported this case, and I just wanted to put that in there, Your Honor. Thank you very much. May it please the Court. James Shin appearing on behalf of Appellant J. Patrick Fleming. And Appellant Fleming is appealing the Rule 11 sanctions which were ordered by the District Court. Now, looking at the Rule 11 sanctions itself, it appears that the Court's sanction itself was based on the filing of the First Amended Complaint, which the District Court held to be frivolous in nature. Now, when we look at the standard, it's an objective standard. And the standard is whether a competent attorney would find that the pleading was well-grounded, in fact, and warranted by law. Now, this is not a subjective standard. Okay, so it's basically, would a competent attorney who's faced with this situation before the filing of the First Amended Complaint believe that this First Amended Complaint is well-grounded, in fact, and warranted by law? Now, what we have in this case back in 2017, when the First Amended Complaint was filed, the attorney should have known that this issue had been decided, well, an issue had been decided by the Ninth Circuit regarding the 2011 agreement. And they had held that it was ambiguous as a matter of law. Now, we also knew at that particular point in time that there were four prior attorneys who had filed pleadings in this matter. And these were competent attorneys as well. There's no indication that they weren't otherwise. And then what we also knew back in 2017 is that there existed a file from Attorney Price, and that this file was turned over to Mr. Fleming. Now, contained in that file, and, you know, the district court went over certain emails in the underlying motion. However, he failed to address emails which were set forth to the court. And these emails are important because it goes to the intent of Attorney Price. And these emails were cited in the record. First of all, there is a June 6, 2011 email, I'm sorry, a June 6, 2011 notice of default from Iron Gate. And that's at the record at volume two, page 192. And importantly, in that notice of default, there is a mention that they are enforcing or they will enforce termination under provision D37. Now, if you're just going at that, you're thinking, okay, well, Iron Gate is still using provision D37 from that original sales contract. And that that provision, at least in Iron Gate's mind, still applies. But what about the district court's conclusion that Mr. Fleming didn't have a reasonable basis in factor law to file the First Amendment complaint based on information in Mr. Price's file? And the district court concluded that that information established that Mr. Price believed that Ms. Wong had, Sonny's child, had waived its claim for all of the deposits. And it seems that the issues are intertwined. So the district court granted summary judgment in Iron Gate's favor on all the contract claims, finding that that intent was clear and that there was no factual dispute that the deposits were waived. And then based on that, also decided that Mr. Fleming, no reasonable attorney, without information would have filed the First Amendment complaint. So if the two are inextricably intertwined, if the court were to reverse summary judgment on the contract claims, would that then moot or obviate the Rule 11 sanctions? Yes, it would, Your Honor. And that's because if the court reversed the district court's finding on the underlying summary judgment motion, then at least as of now, that First Amendment complaint is still what is not a baseless complaint. But I take it your position is even if there is not a reversal, there still should be no Rule 11 for a variety of the reasons that you've laid out. Yes, and I'm arguing the alternative right now on top of that. Yeah, because we wouldn't, I wouldn't need to argue this motion if the court is inclined to reverse the district court on the granting of Iron Gate's motion for summary judgment. So one of your arguments is that Iron Gate did not comply with, strictly comply with, Rule 11 safe harbor provisions and that the motion that they sent was different in some ways from the one that was filed. Were those differences significant? How did that cause any prejudice to Mr. Fleming and Ms. Wong? Well, you know, I'm not going to say, I can't sit here right now and say it was significant. All I, all I know is that it did not strictly comply with these substantial similarity requirement of Rule 11. However, I mean, I realize that, you know, if it didn't comply with the strict requirements, then we could go back down and then be faced with another Rule 11 motion. So I would rather address the merits of the Rule 11 motion right now. Want to save your remaining time? I still got one more minute, Your Honor. And I would also like to address the July 9th email from Warrant Price to Iron Gate as just an evidence that Warrant Price's intent wasn't crystal clear as far as the deposits and what would happen to those deposits in the event of the termination. Also, I would just like to mention that the Gomez case was around for any competent attorney to review. At the time, the First Amendment complaint was filed. And on top of Gomez, there is the Shanghai Investments case. And I know the court had a question for Mr. Revere as to what happens, who makes the determination on damages for the deposits and whether it's reasonably related to the actual damages incurred by the seller. Well, in that case, in the Shanghai Investment case, they were dealing with a similar issue on how to make that computation. And the court specifically referred to the Diaz case and said, and quoted, determination of the proper amount of damages, if any, is within the exclusive province of the jury since they are the sole judges of all disputed questions of fact. So therefore, a competent attorney at the time the First Amendment complaint was filed would know that they at least would have that triable issue to take to the jury as far as whether this withheld deposit was actually reasonably related to the damages incurred by the seller or Iron Gate in this particular case. Thank you. Thank you. Now, Mr. O'Toole. Good morning, Your Honors. Terry O'Toole representing Iron Gate with my associate, Miley Miller. I believe there are several layers of issues here, and I'd like to first address the basically the undisputed facts and lack of any material facts relating to the understanding as to the 2011 settlement agreement. Judge McEwen, you mentioned in response to argument of Mr. Revere that there's the issue of imputation of the belief and understanding and intent of the the issues here. I would submit, and I think it's been briefed, there is not only the imputation, there is the issue, there's two other issues. One has to do with if you take all of the evidence at face value in terms of Ms. Wang's knowledge, and she was the sole representative and owner of these LLCs. Was the district court correct in concluding that there was no issue of material fact? In essence, when you boil it down, and I'd like to come into the record a little bit later on specifically, at best, Ms. Wang testified she didn't understand. At worst, she testified that she relied upon her counsel and specifically asked them to explain Section 4, and the undisputed evidence of her attorneys were that they provided her with explanations as to what those Sections 4 and Sections 8 meant. Wasn't there other communication in the record where I think Mr. Fleming stated that Mr. Price told him he didn't negotiate this contract on her behalf, rather Ms. Wang negotiated with Arngate directly, that he did not advise her of the And also there was testimony that I think Ms. Wang stated that she tried to ask Mr. Hosoda, but he didn't understand the contract, and he told Mr. Fleming he wasn't really involved with this. He may have spoken with Ms. Wang, but he doesn't really remember. So there seems to be some conflict in the record, whoever prevails, as to what the attorney's role was with respect to the state of the record on that, and I think we're into the second part, and that is what did Wang understand, and what was she told, as opposed to what's imputed. Right, and I mean that's really the crux of the matter, because you're saying she's the principal of Sunday's Child, and so it's her intent that's significant, and you're trying to get that first by imputing statements her attorneys have made to establish intent. And as another issue on that point, the cases you cite don't seem to involve using an attorney's knowledge or statements to impute intent to a client. They're different. They're factually different. Do you have a case where the Hawaii courts have held that an attorney's knowledge or understanding can be imputed to their client to establish the client's intent? I think we've cited all the Hawaii cases that are relevant to that point, Your Honor. And none of them say that? I think the closest we have is the Kruger case, which basically talks more in terms of a client, which I think is another prong here, an attorney who is, in fact, the attorney of the client making representations and concluding a transaction on behalf of the client. That's the Kruger case. So that's the extent of the Hawaii law that we were able to find. Then we're kind of back to where we started after the Ninth Circuit. We demanded that, there's this ambiguity as to intent, which typically is a factual issue. I'm not yet hearing from you why this factual issue all of a sudden evaporated on remand, because it seems to me that is the law of the case, that it's a factual issue. And to overcome that, I guess you're saying that we would ignore Sundy's child Wang's testimony. Is that right? No, I'm actually suggesting a couple things. I think with respect to Wang's testimony, her deposition was taken before, in fact, her deposition was taken and then she waived the attorney-client privilege, which unleashed all of the documents that, but for that waiver, we wouldn't have seen. Wang's testimony in her deposition was ranging from, I didn't have an understanding, to I read a page or two, to I relied upon my counsel and asked them what it meant. And the only other thing that's in the record is Wang's declaration, which was not part of the opposition to the summary judgment, to my understanding, it was submitted in opposition to the sanctions motion, which is conclusory at best, and states contrary to what she testified in her deposition, that she would have never signed if she knew that she was going to lose her deposits. So I think here we have literally all of the testimony and sworn testimony of all of the people who had anything to do with that agreement. How is that contradictory or conclusory? Which makes a pretty specific statement that if I had known that someone was going to interpret this contract to mean I was waiving my deposits, I wouldn't have signed it. And you described her earlier testimony about reading it or not reading it, reading parts of it, not understanding it, but that does not seem to be in direct conflict with the specific issue of if she had understood what Iron Gate proposes to be the meaning of the contract, she wouldn't have signed. Well, I think one of my points, Your Honor, is that this declaration was submitted in opposition to a sanctions motion after the motion for summary judgment, I believe. I don't believe there was a parallel affidavit or declaration submitted in opposition to the summary judgment. So when this one came up, it came up after the fact. And I believe it came up, I believe the date is after the court heard the motion for summary judgment. And I wasn't there as to whether the court ruled orally or not. But this is an after the fact. Did anybody ask her that question directly during her deposition? Which question was that? The question of if you had understood that Iron Gate believed that this contract waived all of your deposits, would you have signed it? Well, I'm the one who took her deposition. So I believe, I don't recall whether I asked her that specific question. What I do recall is that at the time I was quizzing her on it, that other than Mr. Fleming allowing her to that apparently happened preceding the signing of her, of the exhibit, that she was instructed not to answer a lot more questions about what happened. But I believe the gist of her testimony is it's what's in the record at this point. And that's she had reduced to its lowest common denominator, no understanding. And where you have counsel who had an understanding, clear understanding and explained. Neither of whom were representing her in these negotiations. And there's conflicting testimony about their involvement or what they may or may not have told her. A few years later, they say that they advised her of the material terms of the 2011 agreement. But at the time, there's indications in the record that they didn't represent her in these negotiations at all and didn't discuss the terms. I actually, I think the record is replete with references to the fact that they were her counsel for a period of five months. So that gets us back to your other argument that without a Hawaii case directly on point, we should impute counsel's belief or knowledge to establish the client's intent. Not something like contract formation, but her actual intent, her state of mind. I think that to the extent that her, yes, to the extent that both counsel had a clear understanding of the document and to the extent that Mr. Hosoda, I can come back to the record, Your Honor, but I don't want to pass by the record in terms of them being representing her from January of 2011 through and after the signing of the agreement. There are references to, by her, that they were her counsel. There are references by them that they were her counsel. I know there is some statement by Fleming who said that Hosoda told him that he had little to do with the 2011 agreement. How does that figure in? Oh, I think it's, I think that's not true. I think that the... Well, but that may not be true, but isn't that whole issue of fact now infused in here? I don't think it is as to who represented Ms. Wang and who did what with respect to negotiation of the agreement. But she said, you've taken issue with the declaration suggesting it's a sham affidavit without necessarily going to that test, but she testified that she received no legal advice from Hosoda about the 2011 agreement before she signed it, and she also testified that she asked Hosoda to explain Section 4, but he didn't understand it any better than she did, and he didn't understand what it meant, and she also testified that Price gave her unspecified legal advice about the agreement, though Price testified that he never reviewed the material terms with her. So there does seem to be some dispute here aside from her declaration about what advice or counsel she received from Mr. Price and Mr. Hosoda. And I think she testified in her deposition that she asked Mr. Hosoda, and Mr. Hosoda testified that he basically took her through the document, including Section 4, including Section 8, explained to her in terms, they both testified that before, during, and after the agreement, she was told in no unconditional terms that she would waive her rights to the deposit. ER-399 and ER-924, Price testified that he reviewed a draft of the 2011 agreement for form before Wang signed it, but never discussed the material terms with her beforehand. And, yes, and Hosoda testified specifically that he reviewed in detail the specifics of the agreement, and this was at Sunday's Volume 4 at 729. Right, he did say that, but he also testified that he did not recall meeting with Wang to discuss the agreement, did not review the 2011 agreement word for word with Wang, and could not fully confirm that he had spoken with Wang about the agreement before she signed it. That's at ER-750-51. I'm not saying which statement is true, but it does seem there are some conflicts in these statements. I think that the evidence taken at a minimum is Wang, before her, at the end of the 11th hour declaration in opposition to the motion for sanctions, her testimony was unequivocally that she didn't have an understanding. She didn't have an understanding. Could you say, excuse me, go ahead. Sir. No, I don't want to interrupt you. Oh, okay. When you're finished, I'll, I have a question. I think I'm finished on that. I believe that the testimony is clear that Wang said she, at best, didn't understand. Hosoda testified, and I can refer to the record, that he explained Section 4 and Section 8 to her before she signed, that there was no question that what the intent was, and his precise language was, one of the reasons we went through that, and for all of the running around we did at the end, was because by signing, she would lose her deposits. And Mr. Price also left a message saying that she would only have a claim for her deposits, and she might not be able to execute or collect on the judgment, and he also requested a tolling agreement for her. So these seem to be actions that indicate that he believed that her claim for the deposits would remain after the 2011 agreement. Well, I think those are communications that happened before May 12, 2011, and it related to him representing her going forward, which was Iron Gate had told all buyers who were in default that if they didn't close, that there would be proceedings to basically keep the, keep the deposits and file a lawsuit. So what he had said, because Wang was not, or Sundys was not made a part of that litigation, he basically said we've got essentially a standstill, and they moved they negotiated the agreement, and I think it's a salient point. Sundys had until May 10, 2011, to agree to the terms of the final settlement agreement. On May 10 at 445, Hosoda sends an email to Iron Gate and confirms that he's been told by Ingrid to accept, and then the document is signed the following day. I think the record leading up to that agreement is crystal clear that almost every one of the documents that came out as a waiver of the attorney-client privilege told her you are at risk at losing your deposits, and the negotiations proceeded, and the documents, I believe, are absolutely clear. I mean, this Court, and I know, Judge Ferris, you were here two years ago when we argued this the last time, we're going from the proposition that the law, the case, and it is the fact that the document was determined to be ambiguous, but the District Court had the ability to look at the entire testimony before it, and I think the three prongs are, and I understand there's difference of views at this point, that yes, the understanding and intent of the attorneys who did, in fact, represent her admitted they represented her, she admitted they represented her. Okay, I need to correct you on the record. Yes. So, the voicemail I was referring to was on June 23rd, 2011, and that's when, that's his ER-198. Mr. Price left a voice mail for Mr. Fleming stating that if Sunday's Child did not close under the 2011 agreement, Sunday's Child would be, quote, left with a lawsuit with an uncollectible judgment, and then he further stated we'll have to proceed with this lawsuit to try to settle, and I'm not optimistic we'll get any cash in the settlement, and then the second part was July 9th, 2011, ER-200, Price explaining to Mr. Grossfeld that Iron Gate has the right to pay Wong nothing back and move for specific performance, and that Wong would still have the right to give back anything over 15 percent. This is net of Iron Gate's costs and fees. So, those communications are after. They are. The execution of the 2011 agreement. They are after, and they are almost contemporaneous with a late May 2011 memorandum from Price to Ingrid telling her that by failing to close, that she had basically forfeited all of her deposits. So, why would Mr. Price tell Mr. Grossfeld basically to invoke the procedures of the 2006 agreement under Section D37 to seek specific performance or to try to establish damages to maintain the deposits if Mr. Price at this point believed that Ms. Wong had, through, for Sundays, had waived all claims to the deposits? Well, in all I can cite to the Court, I'm aware of that document. I think the one that precedes it basically explained to the client what the result was of her failing to sign the agreement, which was consistent with everything that had gone on before the signing of the agreement and after it. So, I understand what's in that document. Would we have to make any factual determinations if we did not remand? No, Your Honor. I don't believe this Court would be making any factual determinations. It seems to me if we have the issue of factual determinations, those factual determinations shouldn't exist, and our argument is they don't. Would we have to discredit Ms. Wong? I think you have the right to look at her late declaration, which to me was not submitted in opposition to the motion for summary judgment, I believe, and not consider it. So, it wasn't stricken from the district court record, so we would have to strike it, correct? I don't know whether you'd need to strike it. I think that the Court could determine that this was submitted not in opposition to the MSJ, and that in point of fact... All of the record is in front of us. Yes. The entire district court record, and we're here on de novo on a summary judgment. So, we're kind of right back to where we started, whether to affirm this, it would appear to me that we would have to discredit her testimony. And the only testimony is the testimony in her declaration? Well, she has the other testimony. I mean, there's the other testimony surrounding what she did and didn't do, correct? Yes, that's right. So, we'd weigh the evidence. We would be weighing the evidence and making a determination. I don't think you have to weigh the evidence. I believe you can choose not to recognize the as being one that was not submitted in connection with the opposition to the summary judgment. And I think you can look to her sworn testimony in the deposition, which leaves the record simply that, at best, she didn't understand. I have nothing further, Your Honors. Thank you. The question on the table is, if you don't have the post-summary judgment declaration, then is there a factual issue? Oh, thank you, Judge McKeown. And that's what we were scrambling with over there. So, in answer to Your Honor's question about would you have to make a factual determination, the answer is yes, and you'd have to disregard what Mr. Price himself was saying contemporaneously. Because at ER-200, which is in July, which is just to correct my colleague, Mr. O'Toole, was after May. In July of 2011, he is stating in black and white, contrary to his later deposition testimony, she might have the right to get back anything over 15 percent. This is net of Iron Gate's costs and fees, which again goes back to my point, which is don't they have to show that, I think the answer is yes, under Hawaii law, what their actual damages are. Mr. Price thinks so in July. In August, again after May, he's saying to her, if I tell her, meaning his own client, this is what he's writing, not copying the client, writing the developer Iron Gate, if I tell her her rights expire in 10 days or something, some lawyer will file something. So, he doesn't say some lawyer who's filing something frivolously or otherwise. And I think the problem with Mr. O'Toole's argument is everything is construed the evidence of the case. So, I think the problem with Mr. Price and Iron Gate at the time, right after this is signed, what do they both do? They both go back to D-37 in that original 2006 agreement. So, they both very clearly thought that is the initial deposit. There are certain consequences about how things play out in those initial deposits. It wasn't magically going away because when Iron Gate was signed in January of 2007, it was a year before the D-37. It's clearly a live issue as this court has already determined when it said these facts are at least ambiguous. I don't have anything further unless Your Honors have... I don't have any real question, but one day if somebody's taken a pin to see how much money we're talking about, if you prevail and get a new trial and do all those things, it's something that counsel will have to decide. We're going to have to decide the case on the record, but I'm just curious because when I take a look at it, we're not talking about very much money. Yeah, well, that's... Johnny come lately to handle this appeal, but Your Honor, point is very well taken. All right. Thank you. Thank you. It appears we have nothing further either. So thank you so much. Thank all counsel for your arguments. Very interesting case. The case of Sunday's Child versus Iron Gate in Fleming is submitted.
judges: Farris, McKeown, Bade